

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-24-00322-CV
No. 02-24-00472-CV

———————————————————

NATALIE STROIK, Appellant, Cross-Appellee, and Appellee

V.

DAVID LEE STROIK, Appellee, Cross-Appellant, and Appellant

On Appeal from the 481st District Court
Denton County, Texas
Trial Court No. 21-11017-367, 20-1192-431

Before Sudderth, C.J.; Bassel and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

David Lee Stroik (Husband) and Natalie Stroik (Wife) agreed to a divorce decree (Divorce Decree) that awarded Wife sole ownership of the marital residence "subject to" certain provisions regarding the residence's appraisal and refinancing. According to Husband, this "subject to" language made the marital-residence award conditional; unless and until Wife refinanced the residence and paid him for his half of the appraised equity, the residence was not hers, and it remained undivided. Consequently, when the appraisal-and-refinancing process stalled and Wife listed the residence for sale, Husband sought court intervention.

Three years, several lawsuits, two interlocutory appeals, and one reversed judgment later, the trial court agreed with Husband that the marital-residence award's "subject to" language made it conditional, and because Wife had not refinanced the residence—which by then had been sold by a receiver and reduced to sales proceeds—the trial court redivided the asset, awarding Husband a disproportionate share. Wife appeals, arguing that this redivision amounted to a modification of the Divorce Decree. Husband, meanwhile, claims not only that the trial court's redivision was proper but also that the court should have awarded him attorney's fees and that he was further entitled to a turnover order to immediately seize the sales proceeds from the court's registry.

The issues thus boil down to a single question of contract interpretation: Was the Divorce Decree's marital-residence award conditioned on the appraisal-and-

2

refinancing provisions or not? It was not. Therefore, we will reverse the trial court's judgment redividing the residence, render judgment that Husband take nothing on his redivision claim, and dismiss Husband's turnover-related appeal as moot.

## I. Background

The parties have been entangled in a web of litigation since their divorce.

## A. 2020: Divorce Decree

In December 2020, Husband and Wife agreed to the Divorce Decree that awarded Wife the marital residence "as her sole and separate property . . . [s]ubject to the provisions as specified in [the section of the decree entitled] *'Provisions Regarding Refinance of Marital Property.'*" The *"Provisions Regarding Refinance of Marital Property"* established a method to determine the amount of equity in the marital residence via one or more appraisals, with the appraisal process beginning "no later than 10 days from the date of this [Divorce Decree]" and ending by a date certain a few months later. Then, "[u]pon settling on a value for the equity in the house," the Divorce Decree required Wife to "begin the refinance process to refinance the mortgage solely into her name" and to "pay directly to [Husband] 50% of the amount of net equity in the residence within 3 days of completion of the refinance." Consistent with this, a different portion of the Divorce Decree awarded Husband "as his sole and separate property . . . [p]ayment of 50% of the equity in the house as specified under *'Provisions Regarding Refinance of Marital Property.'*" The Divorce Decree did not expressly contemplate a sale of the residence or a failure to refinance.

3

## B.    2021:  Enforcement Action, Temporary Injunction, and Judgment

Neither the appraisal process nor Wife's refinancing went smoothly, and when Wife could not refinance,[1] she listed the residence for sale.  Husband petitioned the trial court to enjoin the sale and clarify the marital-residence award while also seeking enforcement of other aspects of the Divorce Decree (Enforcement Action).[2]  *See* Tex. Fam. Code Ann. §§ 9.001–.014 (providing in Subchapter A for action asking trial court that rendered the divorce decree to clarify or enforce its decree).

In mid-2021, the trial court entered a temporary injunction (Enforcement Injunction) interpreting and purporting to "clarif[y]" the marital-residence award.  The court found that the Divorce Decree did not authorize Wife to sell the residence and that ownership would transfer to Wife only "once the [refinancing] conditions . . . ha[d] been met."  It enjoined Wife from selling the residence unless Husband agreed in writing, and it provided for an even division of any sales proceeds. Wife filed an interlocutory appeal.  *See generally Stroik v. Stroik (Stroik I)*, No. 02-21-

---

[1]Husband later testified that he did not believe refinancing "could []ever have taken place."  He gave two explanations:  (1) both he and Wife had filed bankruptcies, and "after you have a Chapter 7 bankruptcy, you cannot get a mortgage . . . for ten years"; plus (2) Wife's salary was insufficient to qualify for the loan amount needed so it would have been "literally . . . impossible" for her to obtain a new mortgage.

[2]While the Enforcement Action was pending, the case was transferred to a different district court, and still later, it was transferred again.  Nonetheless, we refer to the district court overseeing the case as the "trial court" for all actions taken under the divorce's cause number.

00207-CV, 2022 WL 5240394, at *1–2 (Tex. App.—Fort Worth Oct. 6, 2022, no pet.) (per curiam) (mem. op.).

But while Wife's interlocutory appeal was pending, the trial court proceeded. The court held a trial on Husband's Enforcement Action, and it incorporated the Enforcement Injunction—including its "clarification" of the marital-residence award—into a final judgment (Enforcement Judgment). The court did not further dispose of the residence, though, because Husband—who had been seeking appointment of a receiver to sell the marital residence up until that point—abandoned his receivership request just before the Enforcement Judgment was rendered.[3] Regardless, Wife appealed, arguing that the Enforcement Judgment modified the Divorce Decree. *See Stroik v. Stroik (Stroik II)*, No. 02-22-00092-CV, 2023 WL 6475645, at *1 (Tex. App.—Fort Worth Oct. 5, 2023, pet. denied) (mem. op.); *see generally* Brief of Appellant at 13–20, *Stroik II*, 2023 WL 6475645 (No. 02-22-00092-CV).

---

[3]Husband orally nonsuited his receivership request a few days before the Enforcement Judgment, and he filed a written notice of nonsuit the morning the Enforcement Judgment was rendered. But the parties had tried the case and closed the evidence several months before. *See* Tex. R. Civ. P. 162 (recognizing right to nonsuit "before the plaintiff has introduced all of his evidence other than rebuttal evidence"). Nonetheless, on the morning the trial court rendered the Enforcement Judgment, it entered a separate order "hereby nonsuit[ing] without prejudice" the relevant aspects of Husband's case. We express no opinion regarding the effect of Husband's purported nonsuit.

## C. 2021: Residence Action and Receivership Order

Meanwhile, with Wife's appeals from the Enforcement Injunction and Enforcement Judgment pending, Husband pressed on. Having nonsuited his receivership request in the Enforcement Action, Husband filed an original, residence-specific lawsuit (Residence Action). He claimed that the Divorce Decree had not disposed of the marital residence, so he sought a new, post-divorce, just and right division of the asset.[4] *See* Tex. Fam. Code Ann. §§ 9.201–.205 (providing in Subchapter C for original post-divorce action seeking division of undivided marital property); *cf. id.* § 9.004 (stating that Subchapter A procedures and limitations "do not apply to existing property not divided on divorce, which are governed by Subchapter C"). The trial court appointed a receiver to sell the residence (Receivership Order), and Wife again filed an interlocutory appeal. *See Stroik v. Stroik (Stroik III)*, No. 02-22-00060-CV, 2022 WL 2979172, at *1 (Tex. App.—Fort Worth July 28, 2022, no pet.) (per curiam) (mem. op.); *see also Stroik I*, 2022 WL 5240394, at *1 & n.2.

## D. 2022–2023: Appeals

At that point, three appeals were pending—those from the Enforcement Injunction, Enforcement Judgment, and Receivership Order—and all three of them touched on the marital-residence award's interpretation. But before any of those

---

[4]Although Husband filed his Residence Action with the district court that was overseeing his Enforcement Action, the Residence Action was a separate cause; it was not a continuation of the divorce cause. *See infra* note 18.

6

appeals could be resolved, the receiver sold the residence, mooting Wife's interlocutory appeals from the Enforcement Injunction and Receivership Order.[5]  *See Stroik I*, 2022 WL 5240394, at *1–2 & n.4; *Stroik III*, 2022 WL 2979172, at *1.  And although we later reversed the Enforcement Judgment in 2023, our reversal was on due process grounds; we did not reach the trial court's purported clarification of the marital-residence award.[6]  *Stroik II*, 2023 WL 6475645, at *1–6.

## E.    2023–2024:  Residence Judgment

Meanwhile, back in the Residence Action—and while Wife's appeal from the Enforcement Judgment was still pending—the trial court determined that the marital-residence award was conditional.  It found that the Divorce Decree had "conditionally awarded the Marital Residence to [Wife], subject to the provisions for refinancing the

---

[5]Wife moved for reconsideration of one of these dismissals—that from the Enforcement Injunction—asserting that there remained a live controversy between the parties regarding whether the Enforcement Injunction had misinterpreted and modified the Divorce Decree's marital-residence award.  *See* Motion to Reconsider and Motion to Consolidate at 2–6, *Stroik I*, 2022 WL 5240394 (No. 02-21-00207-CV).  In an effort to persuade us to deny reconsideration, Husband conceded the issue.  In a letter to this court, Husband "concede[d] that the portions of the appealed [Enforcement Injunction,] the subject of both this interlocutory appeal, and the companion [*Stroik II*, challenging the Enforcement Judgment], that dictate how net proceeds from the sale of the community property residence would be divided constitute a modification of the [Divorce Decree]."  *See* Sept. 10, 2022 Letter at 1–2, *Stroik I*, 2022 WL 5240394 (No. 02-21-00207-CV).  Ultimately, we denied reconsideration, noting that we could address any lingering live controversies in Wife's pending appeal from the Enforcement Judgment.  *Stroik I*, 2022 WL 5240394, at *1 n.3, *2 n.5.

[6]According to Wife, the trial court has not held any further proceedings on the reversed claims.

mortgage debt thereon, and payment to [Husband] of 50% of the equity"; that because "the parties did not agree on a value of the equity," Wife's "duty to refinance . . . did not accrue"; and that because the residence "was never refinanced," the spouses "became tenants-in-common." In other words, the court concluded that the marital residence "was not divided in the Agreed [Divorce] Decree." It rendered judgment (Residence Judgment) with a new just and right division of the residence, awarding Husband a disproportionate share of the sales proceeds.[7] Both parties appeal this Residence Judgment—the first two appeals before us.[8]

## F.    2024:  Turnover Judgment

But the saga does not end there. Back in the trial court, and within days of the Residence Judgment's entry, Husband applied for turnover relief to seize Wife's portion of the marital-residence sales proceeds. In his application, he sought to satisfy a separate judgment that he had secured against Wife by asking the trial court for (1) a turnover order to access the sales proceeds in the Residence Action's court registry and (2) the appointment of a receiver to take possession of the registry funds and to seize and sell Wife's other nonexempt assets. The trial court denied the turnover

---

[7]The trial court's findings explain that the disproportionate division reflects offsets for various residence-related debts that had accrued.

[8]These two appeals are docketed as Cause No. 02-24-00322-CV.

8

application (Turnover Judgment), and Husband appeals—the third appeal now before us.[9]

## II. Discussion

All of the present appeals come down to a single, dispositive, long-awaited issue: Whether the Divorce Decree's marital-residence award was conditioned on the appraisal-and-refinancing provisions such that, unless Wife refinanced and paid Husband from the proceeds of the refinance, the residence remained undivided. Wife answers "no" and thus asserts that the trial court's Residence Judgment effectively modifies the Divorce Decree by redividing the residence.[10] Husband argues to the contrary.

## A.    Standard of Review and Governing Law

The trial court that renders a divorce decree retains continuing subject matter jurisdiction over post-divorce actions to enforce the decree and to clarify ambiguities in the property division. Tex. Fam. Code Ann. §§ 9.002, .008 (authorizing in Subchapter A enforcement and clarification of divorce decree); *Hagen v. Hagen*, 282 S.W.3d 899, 902 (Tex. 2009); *Wagner v. Davis*, No. 02-19-00249-CV, 2020 WL 241381, at *2 (Tex. App.—Fort Worth Jan. 16, 2020, no pet.) (mem. op.). Or, if a marital asset is overlooked and not divided in the divorce decree at all, then a spouse may file

---

[9]This appeal is docketed as Cause No. 02-24-00472-CV.

[10]Wife raises this argument in two of her three appellate issues.

9

a separate lawsuit seeking a post-divorce, just and right division of that undivided asset. *See* Tex. Fam. Code Ann. §§ 9.201(a), .203(a) (providing in Subchapter C for original post-divorce division); *see also S.C. v. M.B.*, 650 S.W.3d 428, 440–50 (Tex. 2022) (explaining that Subchapter C "provides no mechanism to *disturb* finality, but instead provides a way to *establish* finality for a property that was never subject to a decree" and holding that a Subchapter C proceeding need not be filed in an original divorce court). In either instance, the court may not "amend, modify, alter, or change the division of property made or approved in the decree of divorce." Tex. Fam. Code Ann. § 9.007(a); *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011); *Hagen*, 282 S.W.3d at 902; *Wagner*, 2020 WL 241381, at *2–3. Such a modification amounts to an "impermissible collateral attack" on the final divorce decree. *Hagen*, 282 S.W.3d at 902 (noting that divorce decrees, "[a]s with other final, unappealed judgments . . . are not vulnerable to collateral attack"); *see S.C.*, 650 S.W.3d at 441 (emphasizing that Subchapter C "allows property *that was never divided* to be divided *for the first time*," and noting that "nothing in Subchapter C provides any escape from the rule that a wrongful division can be challenged only by appeal"); *Pearson*, 332 S.W.3d at 363 ("A judgment finalizing a divorce and dividing marital property bars relitigation of the property division.").

Whether a post-divorce order disposes of marital property overlooked in the decree or impermissibly modifies the decree's property division depends on the

10

language of the decree itself. *See Knorr v. Knorr*, No. 02-20-00332-CV, 2021 WL 4319710, at *3 (Tex. App.—Fort Worth Sept. 23, 2021, no pet.) (mem. op.).

An agreed divorce decree is a contract, so its language is interpreted accordingly. *Id.*; *Wagner*, 2020 WL 241381, at *3; *Waldrop v. Waldrop*, 552 S.W.3d 396, 402 (Tex. App.—Fort Worth 2018, no pet.) (op. on reh'g en banc); *In re W.L.W.*, 370 S.W.3d 799, 804 (Tex. App.—Fort Worth 2012, orig. proceeding). "Our primary concern when interpreting an agreed divorce decree is to ascertain and give effect to the intent of the parties as [that intent] is expressed in the agreement."[11] *Waldrop*, 552 S.W.3d at 402; *see Loya v. Loya*, 526 S.W.3d 448, 451 (Tex. 2017); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). We interpret terms based on their ordinary meanings and construe the contract as a whole to harmonize its provisions and give effect to the entire agreement. *Occidental Permian, Ltd. v. Citation 2002 Inv. LLC*, 689 S.W.3d 899, 905 (Tex. 2024); *Coker*, 650 S.W.2d at 393; *Waldrop*, 552 S.W.3d at 402; *see Loya*, 526 S.W.3d at 452 (referencing dictionary definitions to interpret terms used in agreed

_____

[11]Husband asserts that, because a contract must be construed to give effect to the parties' intentions, his subjective intentions—which he sets forth in his brief—should be considered. But an unambiguous contract is construed to give effect to the parties' intent as that intent is expressed in the agreement; the parties' unwritten, subjective intent is irrelevant. *See Ideal Lease Serv., Inc. v. Amoco Prod. Co., Inc.*, 662 S.W.2d 951, 953 (Tex. 1983) (clarifying that "unless ambiguous, we must discern [the parties'] intent from the contract itself" and "are precluded from expanding the scope of this coverage beyond that stated in the contract based solely upon what this Court may perceive to be the improperly expressed intentions of the parties"); *Morin v. Morin*, No. 02-23-00349-CV, 2024 WL 2854875, at *3 (Tex. App.—Fort Worth June 6, 2024, no pet.) (mem. op.) ("Objective manifestations of intent control, not the subjective intent of the parties." (internal quotation marks omitted)).

division of marital property); *Bernhardt v. Bernhardt*, No. 02-22-00206-CV, 2023 WL 2607753, at *3–4 (Tex. App.—Fort Worth Mar. 23, 2023, pet. denied) (mem. op.) (similar, referencing dictionary definitions to interpret language used in agreement incident to divorce). "[W]e presume that using different language in different parts of [the] contract means the parties intended different things." *Pro Health, LLC v. Elite Jet Sols., LLC*, No. 02-23-00111-CV, 2024 WL 1670900, at *3 (Tex. App.—Fort Worth Apr. 18, 2024, no pet.) (mem. op.) (internal quotation marks omitted); *see Utica Nat. Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004) (op. on reh'g). And if, upon reading the whole contract, "the terms are unambiguous, we must effectuate the [agreed divorce decree] in light of the actual language used." *Wagner*, 2020 WL 241381, at *3; *see Knorr*, 2021 WL 4319710, at *3.

The interpretation of an unambiguous contract is a question of law, as is whether the contract is unambiguous to begin with.[12] *Occidental Permian*, 689 S.W.3d at 904–05; *Coker*, 650 S.W.2d at 394; *Bernhardt*, 2023 WL 2607753, at *3. We review such questions of law de novo. *Occidental Permian*, 689 S.W.3d at 904–05; *Bernhardt*, 2023 WL 2607753, at *3.

---

[12]Neither party claims that the Divorce Decree is ambiguous. "Even when parties consider a contract unambiguous, though, the presence of ambiguity and the interpretation of a contract are questions of law, which we review de novo." *Pro Health*, 2024 WL 1670900, at *3.

## B. Interpretation of Marital-Residence Award

Here, the plain language of the Divorce Decree awards the marital residence to Wife "[s]ubject to the provisions as specified in '*Provisions Regarding Refinance of Marital Property.*'" The "subject to" phrase is the centerpiece of Husband's argument that the marital-residence award is conditional.[13] He insists that "Texas Courts have held that the words 'subject to' denote conditional language indicating an intent to create a condition precedent to a binding agreement," and he cites several cases that he claims interpreted the phrase in that manner.[14]

---

[13]Husband asserts that, in the Enforcement Action, Wife made judicial admissions that are "fatal to any argument she presents in her brief" regarding the marital-residence award's interpretation. But even assuming that the relevant statements were judicial admissions, they relate to the alleged conditionality of other aspects of the Divorce Decree—not that of the marital-residence award. Moreover, even if the statements addressed the marital-residence award's conditionality, the construction of an unambiguous contract is a question of law, *see id.*, and "[p]arties may not judicially admit a question of law," *Hoskins v. Fuchs*, 517 S.W.3d 834, 841 (Tex. App.—Fort Worth 2016, pet. denied).

[14]Husband cites cases involving contract-formation disputes. *See, e.g.*, *Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 745–46 (Tex. 1988) (reviewing contract-formation dispute, holding that fact issue existed regarding parties' intent to be bound, and noting that "the 'subject to legal documentation' language is not conclusive on intent to contract" so issue was properly submitted to jury); *John Wood Grp. USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 16–18 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (reviewing contract-formation dispute, holding no fact issue regarding parties' intent to be bound, and contrasting *Foreca*'s "conditional language" with parties' "express[] state[ment]" that the letter agreement 'is not binding'"); *Hardman v. Dault*, 2 S.W.3d 378, 380–81 (Tex. App.—San Antonio 1999, no pet.) (op. on reh'g) (reviewing contract-formation dispute; holding no fact issue regarding parties' intent to be bound by settlement agreement; and noting that, unlike *Foreca*, "[t]here is no 'subject to' language in the settlement memorandum"); *Martin v. Black*, 909 S.W.2d 192, 196–97 (Tex. App.—Houston [14th Dist.] 1995, writ denied)

### 1. "Subject to" Phrase

What Husband fails to acknowledge, though, is that the phrase "subject to" can be used in multiple ways; it cannot be read in isolation. *See Occidental Permian*, 689 S.W.3d at 908 (construing "subject to" phrases in contract assigning mineral interests); *Subject to*, Merriam-Webster, https://www.merriam-webster.com/dictionary/subject%20to (last visited May 7, 2025) (providing multiple definitions of phrase). In one situation, the phrase may mean "subordinate to, subservient to[,] or limited by." *Occidental Permian*, 689 S.W.3d at 908; *see Subject to*, Merriam-Webster, https://www.merriam-webster.com/dictionary/subject%20to (last visited May 7, 2025) (defining phrase as, among other things, "dependent on something else to happen or be true"). But in another situation, the phrase may identify a "term that does not limit the scope of the conveyance but instead notifies the grantee of a right or obligation attendant to the property conveyed." *Occidental Permian*, 689 S.W.3d at 908; *see Subject to*, Merriam-Webster, https://www.merriam-webster.com/dictionary/subject%20to (last visited May 7, 2025) (defining phrase as, among other things, "affected by or possibly affected by (something)"); *see also Subject*, Webster's Third New International Dictionary (reprt. 2021) (1961) (defining "subject" as, among other things, "to make accountable"; to "make submit to a particular action or effect"). The mere fact that "subject to" is used in one manner in a given

_____

(reviewing contract-formation dispute, discussing *Foreca*, and holding fact issued existed regarding intent to be bound).

document does not mean that the same meaning is intended in another document. *Cf. In re Off. of the Att'y Gen. of Tex.*, 456 S.W.3d 153, 155–56 (Tex. 2015) (orig. proceeding) (interpreting statute; noting "the enormous power of context to transform the meaning of language"; and cautioning that "[t]he import of language, plain or not, must be drawn from the surrounding context, particularly when construing everyday words and phrases that are inordinately context-sensitive"). Rather, "courts are to interpret the phrase 'subject to' in context to determine its intended effect." *Occidental Permian*, 689 S.W.3d at 908.

### 2.    Divorce Decree as a Whole

In context, the Divorce Decree's "subject to" phrase is buried within its listing of the assets awarded to Wife.   And apart from the phrase itself, the language describing the marital-residence award is conspicuously unqualified:

Property to Wife

IT IS ORDERED AND DECREED that [Wife] is awarded the following as her sole and separate property, and [Husband] is divested of all right, title, interest, and claim in and to that property:

W-1.  Subject to the provisions as specified in "*Provisions Regarding Refinance of Marital Property*" below, the following real property, including but not limited to any escrow funds, prepaid insurance, utility deposits, keys, house plans, home security access and code, garage door opener, warranties and service contracts, and title and closing documents:  [the marital residence]

The Divorce Decree goes out of its way to clarify the broad scope of the property awarded, giving Wife "all right, title, interest, and claim" to not just the

15

marital residence but everything attendant to it, "including but not limited to" a nonexhaustive list of items, right down to the "garage door opener." And its use of present-tense language—"is awarded" and "is divested"—evinces an intent for the award to take effect immediately.

Then, to effectuate this marital-residence award, another portion of the Divorce Decree directs Husband to "execute, have acknowledged, and deliver to [Wife] . . . by 5 days from the date of this [Divorce Decree] . . . [a] Special Warranty Deed" for the marital residence and "to deliver to [Wife] within 5 days from the date of this [Divorce Decree] . . . [a]ll title documents, tax statements, insurance policies, house plans, warranties and service contracts, title and closing documents, and keys for [the marital residence]." Once again, these residence-delivery directives imply that the change in ownership is intended to take effect immediately and to be implemented with haste. The directives make no mention of appraisal or refinancing, nor do they align with the timeline for those procedures, which, as we shall see, are not required to begin until a full "10 days from the date of th[e Divorce Decree]."

Meanwhile, the Divorce Decree's distribution of the residence-related debts is consistent with the immediate effect of the marital-residence award. The Divorce Decree orders Wife to "pay, . . . [and to] indemnify and hold [Husband] and his property harmless from" the "balance due . . . on the promissory note . . . secured by deed of trust on the real property awarded in this decree to [Wife]." Like the residence-delivery directives, this imposition of debt makes no mention of appraisal or

16

refinancing. And it expressly characterizes the marital residence as being "awarded in this decree to [Wife]," reiterating the parties' intent for such award to take effect at the time of the Divorce Decree rather than upon a later event.

Even the appraisal-and-refinancing provisions themselves—the "Provisions Regarding Refinance of Marital Property" that the marital-residence award is "[s]ubject to"—are consistent with the immediacy reflected elsewhere in the Divorce Decree. The provisions carry a procedural, rather than a conditional, tenor:

*Provisions Regarding Refinance of Marital Property*

IT IS AGREED AND IT THEREFORE ORDERED that [Wife] shall receive l00% of the community interest in the marital residence . . . under the following provisions:

1.      The parties will have one appraisal performed on the house with the costs being split equally between [them]. The appraisal process must begin no later than 10 days from the date of this [decree], with each party paying the appraisal fees by that date.

2.      If either party decides to get a second or third appraisal, that party will be solely responsible for the cost.

3.      No more than three appraisals will be performed on the house.

4.      The average value of all appraisals performed will be used to determine the amount of equity in the residence, if more than one appraisal are [sic] performed.

5.      All appraisals must be completed no later than April 1, 2021.

6.      Upon settling on a value for the equity in the house, [Wife] must begin the refinance process to refinance the mortgage solely into her name.

17

7. [Wife] shall pay directly to [Husband] 50% of the amount of net equity in the residence within 3 days of completion of the refinance of the marital residence into her name.

Notably, the last step of the process is not Wife's receipt of the residence or Husband's execution or delivery of a deed to the residence. Again, the residence-delivery directives are located elsewhere in the Divorce Decree and require Husband to execute and deliver a deed to Wife within five days, long before the appraisal process is complete. The appraisal-and-refinancing provisions' seventh step, in contrast, is Wife paying Husband for his half of the equity. This payment fulfills a different aspect of the Divorce Decree: the award to Husband, "as his sole and separate property[,] . . . [of p]ayment of 50% of the equity in the house as specified under '*Provisions Regarding Refinance of Marital Property*.'"

The phrase "as specified under" is yet another term that references the appraisal-and-refinancing provisions without identifying them as conditions. "As specified under" indicates that the "detail[s]" of the equity payment are spelled out in the appraisal-and-refinancing provisions—not that Husband's equity award is contingent upon Wife's refinancing, much less that Wife's payment to Husband is itself a condition for something else. *See Specify*, Merriam-Webster, https://www.merriam-webster.com/dictionary/specified (last visited May 7, 2025) (defining "specify" as, among other things, "to name or state explicitly or in detail"); *Specify*, Webster's Third New International Dictionary (reprt. 2021) (1961) (similar).

The appraisal-and-refinancing provisions' introduction adds a third non-conditional phrase to the mix. It states that Wife is receiving the marital-residence award "under the following provisions"—not "after" or "if" the following provisions are fulfilled. *See Under*, Webster's Third New International Dictionary (reprt. 2021) (1961) (defining "under" as, among other things, "in accordance with"; "required by"); *Under*, Merriam-Webster, https://www.merriam-webster.com/dictionary/under (last visited May 7, 2025) (defining "under" as, among other things, "subject to the authority, control, guidance, or instruction of" as in "under the terms of the contract").

Meanwhile, one phrase is glaringly absent from all of this: "condition precedent." *Cf. Bernhardt*, 2023 WL 2607753, at *3 (interpreting agreement incident to divorce that divided parties' property and noting that, "[p]arties to a contract are masters of their own choices and are entitled to select what terms and provisions to include in or omit from a contract"). And another section of the Divorce Decree demonstrates that, when Husband and Wife intended for an award to be conditional, they used this unmistakable phrase to make it abundantly clear.

In dividing certain marital business interests,[15] the Divorce Decree expressly and repeatedly identifies particular provisions as "condition[s] precedent." It states that "the truth and accuracy" of certain "represent[ation]s and warrant[ie]s" made by

---

[15]The agreement dividing the relevant business interests was attached to the Divorce Decree as an exhibit and was "fully incorporated" therein.

Husband "shall constitute a condition precedent to [Wife's] obligations." And, later, it reiterates that "[Wife's] obligations [regarding the business interests] . . . are subject to the satisfaction of the following conditions precedent by [Husband]." Then, to drive the point home, the Divorce Decree spells out exactly what the parties mean by "condition precedent," stating that "[t]he failure of any of the conditions in [the relevant subsections] shall relieve [Wife] from all obligations . . . from the date of the failure of the condition."

These unambiguous expressions of conditionality stand in stark contrast to the "subject to" phrase accompanying the marital-residence award. And by choosing different wording—using the phrase "condition precedent" in one portion of the Divorce Decree while omitting it from the appraisal-and-refinancing provisions and from the marital-residence award—we can presume that Husband and Wife intended different meanings. *See Utica Nat. Ins. Co.*, 141 S.W.3d at 203 (construing insurance contract and reasoning that, "[s]ince the policy used different wording—'arising out of' versus 'due to' in parallel exclusions—we conclude that the phrases should have different meanings in the context of this policy"); *Pro Health*, 2024 WL 1670900, at *3 (construing contract and "presum[ing] that the different terms used in the provision—'Owner,' 'Broker,' 'agent,' 'representative,' and 'undersigned'—were intended to have different meanings"); *Mr. W Fireworks, Inc. v. Ozuna*, No. 04-08-00820-CV, 2009 WL 3464856, at *7 (Tex. App.—San Antonio Oct. 28, 2009, pet. denied) (mem. op.) (construing leases and "assum[ing] that because the parties used

20

the word 'terminate' three other times in the leases, but instead chose to use the word 'void' when discussing the illegalization of the sale of fireworks, the parties meant 'void' to mean something different from 'terminate'").

### 3. Husband's Reliance on *Snodgrass*

The "subject to" phrase also stands in stark contrast to the property-division language interpreted in *Snodgrass*—a case heavily relied upon by Husband. *See Snodgrass v. Snodgrass*, 332 S.W.3d 653, 657–58 (Tex. App.—Houston [14th Dist.] 2010, no pet.). There, the divorce decree[16] stated that, "[u]pon the refinancing of [the relevant real property] on or before [the deadline], [the wife] is awarded [that property]." *Id.* at 657. The decree thus temporally and causally linked the property award to the refinancing; such award would take effect "upon" the refinancing and not before it. *See id.* Here, the Divorce Decree's marital-residence award contains no temporal or causal ties to appraisal or refinancing. Far from it—the Divorce Decree instead links the marital-residence award to the Divorce Decree itself by requiring Husband "to deliver to [Wife] within 5 days from the date of th[e Divorce Decree] . . . [a]ll title documents . . . and keys for" the marital residence and to "execute, have acknowledged, and deliver to [Wife] . . . by 5 days from the date of th[e decree] . . . [the] Special Warranty Deed" for the residence.

---

[16]The *Snodgrass* decree was not agreed to by the spouses, so it was not subject to the rules of contract interpretation—another aspect of the case that distinguishes it from the one before us. *Snodgrass*, 332 S.W.3d at 655, 657.

21

Coincidentally, the *Snodgrass* decree contained a comparable deed-delivery requirement for a different real-property award. *See id.* at 655. It awarded a piece of real property to the husband and required the wife "to execute and deliver . . . a deed to th[e] property by [a date certain not long after the decree]." *Id.* Although this property award was not at issue in the *Snodgrass* appeal, the descriptor our sister court chose for it aligns with our interpretation of the marital-residence award here: "unconditiona[l]." *Id.*

### 4. Unambiguous, Unconditional Award

Reading the Divorce Decree as a whole, the plain language unambiguously demonstrates the parties' agreement to immediately and unconditionally award Wife "100% of the community interest" in the marital residence with the understanding that such award was accompanied and affected by—"subject to"—Wife's agreement to fulfill other obligations. *See Occidental Permian*, 689 S.W.3d at 908–09 (noting that a "subject to" provision may state a "term that does not limit the scope of the conveyance but instead notifies the grantee of a right or obligation attendant to the property conveyed," and interpreting one "subject to" provision as "describ[ing the] rights and obligations that remain on the land post-transfer" and another as "burdens" on the conveyance); *Subject to*, Merriam-Webster, https://www.merriam-webster.com/dictionary/subject%20to (last visited May 7, 2025) (defining phrase as, among other things, "affected by or possibly affected by (something)"). The marital residence is Wife's "sole and separate property" and has been since the day of the

Divorce Decree; the award was not conditioned on the appraisal scheme, nor on Wife's refinancing, nor on Wife's equity payment to Husband. The trial court thus erred by finding that the Divorce Decree's marital-residence award was conditional, by concluding that the Divorce Decree did not divide the marital residence, and by redividing the asset.

We sustain Wife's two dispositive issues contending as much.

### III. Conclusion

We reverse the Residence Judgment, thereby mooting Wife's remaining issue and Husband's cross-appeal.[17] *See* Tex. R. App. P. 47.1. Because redivision of the marital residence was the sole basis for Husband's Residence Action, *see* Tex. Fam. Code Ann. § 9.201(a) (authorizing Subchapter C suit "to divide property not divided or awarded to a spouse in a final decree of divorce"), and because such redivision is barred as a matter of law for the reasons already explained, we render judgment that Husband take nothing on his redivision claim.[18] *See* Tex. R. App. P. 43.2(c), 43.3;

---

[17]Husband's argument that he is entitled to attorney's fees relies on his status as "the prevailing party" and on a resolution of Wife's Residence Judgment appeal in his favor. *See generally* Tex. Fam. Code Ann. § 9.205 (providing that trial court "may award reasonable attorney's fees" in a Subchapter C proceeding).

[18]Wife contends that, because the marital residence was divided in the Divorce Decree, because the trial court that rendered the Divorce Decree could not modify it after its plenary power had expired, and because the court's plenary power had long since expired, the trial court lacked subject matter jurisdiction to enter the Residence Judgment, and its order was void. To support her argument, Wife points to case law involving Subchapter A post-divorce claims filed in a divorce court to enforce or clarify a divorce decree. *See* Tex. Fam. Code Ann. §§ 9.001–.014. But the Residence

23

*Loya*, 526 S.W.3d at 450, 453 (noting that trial court rendered take-nothing judgment in original post-divorce property division and similarly rendering judgment); *Chintam v. Chintam*, No. 05-22-00022-CV, 2023 WL 5345829, at \*10 (Tex. App.—Dallas Aug. 21, 2023, no pet.) (mem. op.) (affirming take-nothing judgment and explaining that, because certain bank accounts were divided in the divorce decree, "[F]amily [C]ode § 9.201 does not apply, and the trial court correctly denied relief").

As for Husband's separate appeal from the Turnover Judgment, our disposition of the Residence Judgment moots this as well, so we dismiss that appeal for want of jurisdiction. *See* Tex. R. App. P. 43.2(f), 47.1.

All remaining motions and objections are denied, including Husband's request for Rule 52.11 sanctions, *cf.* Tex. R. App. P. 52.11 (authorizing bad-faith sanctions in an original proceeding), and his objections to the default distribution of appellate

---

Action was not a Subchapter A claim, and the Residence Judgment was not rendered in the divorce cause.

Husband's Residence Action sought relief under Subchapter C, which authorizes a trial court—not necessarily the trial court that rendered the divorce decree—to divide an undivided asset that was owned as community property at the time of the parties' divorce. *See id.* §§ 9.201–.205; *S.C.*, 650 S.W.3d at 442–50 (holding that court that rendered divorce decree does not have exclusive jurisdiction over Subchapter C action nor does Subchapter C prevent a spouse from seeking partition instead). Here, although the district court serving as the parties' divorce court was also overseeing the Residence Action, the Residence Action was a separate cause. *See supra* note 4. The Residence Judgment thus does not implicate the trial court's plenary power. *See S.C.*, 650 S.W.3d at 442 (noting that, if a party "seek[s] to attack, modify, or otherwise disturb the finality of the divorce decree" via Subchapter C, "the answer [is not] to send [that party] to the original divorce court—it [is] to bar [the] claim in *every* court under *res judicata*").

costs, *cf.* Tex. R. App. P. 43.4 (providing for award of appellate costs to the prevailing party absent good cause or law requiring otherwise).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: May 15, 2025